**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. 17-cv-02755-RM-MEH**

**MICHAEL BALDUCCI,**

**Plaintiff,**

**v.**

**CONGO LTD., a Colorado Corporation,**

**Defendant.**

---

**DECLARATION OF MICHAEL BALDUCCI IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT**

---

I, Michael Balducci, being first duly sworn, depose and state as follows:

1. I am over the age of eighteen (18) and have personal knowledge of the facts described below based upon my experience and recollection, and I would competently testify to those facts.

2. I am the Plaintiff in the above-captioned matter and a resident of the State of California.

3. I have over 15 years of progressive and professional experience working with startups to Fortune 500 companies to assist in growing their businesses effectively and efficiently online.

4. From creative branding strategies, search engine marketing, social media, email, press, and more, I have held executive positions as the head of marketing inside startups.

5. I have also acted as CEO of my own company, Ultimate Business Consulting, LLC, since 2006.

6. To date, my strategies have helped drive over $1B in revenue online for my companies and clients. Additionally, my reputation, work, and noted results have also helped my startups and clients raise over $100M in private equity and venture capital funding.

7. I have a diverse, yet highly unique skill set, process, and systems that utilize behavioral data combined with neuroscience to create and personalize systems to grow traffic, customers and revenue online.

8. For SEO type work, I typically bill $200/hour, which is considered one marketing channel of work.

9. For a CMO (Chief Marketing Officer), Advisor CMO, or Outsourced CMO type role, I bill $375/hour, which is comparable to bay area compensation, my experience, value, and amount of work managing multiple product & marketing channels, team members, and vendors.

10. For "performance" type work, I typically bill $200/hour (or set base pay / month) plus I earn commissions based on a percentage of sales revenue attributed to results I generate for a client. Performance type work involves multiple channels and teams, and a longer contract engagement that can range from 1-3 years of work and compensation.

11. I entered into a contractual employment agreement with Congo in July 2016. This employment agreement included a Restricted Share Agreement. A true and correct copy of the Employment Agreement and Restricted Share Agreement is attached hereto as Exhibit 1.

12. I was granted 150,000 shares upon hire. During my employment, I worked overtime on the planning, strategy, and architecture of the LawBooth.com (Congo) legal

marketplace to help businesses and consumers connect with attorneys on demand for all of their legal needs. I was spearheading the overall growth of the marketplace to have over 5 million web pages to be deployed online. Web page content was to be targeted by type of attorney (or legal need) and by city, state, and federal law.

13. We planned to deploy most of these web pages live just before my termination. It was only after I was terminated that LawBooth (Congo) said it was not going to pursue this anymore. This was never mentioned leading up to the firing and it was one of the core reasons I was hired to the team, the main growth strategy for the company, and what most focus was on with team members.

14. If these web pages were deployed as planned, I would have been granted an additional 2.5% (250,000 shares) of equity. I was flying to Austin to help raise the funding and met with multiple investors while there to pitch. I was told that the funding was going through and then I was fired right after. They took all my work and raised on it, and then fired me to save on giving out the equity per the agreement.

15. I believe that if my contract had not been breached, I would have been entitled to 400,000 shares. On October 9, 2017, these shares were valued at $0.40 per share, or $160,000.00. This is the most accurate estimate of value that I have determined based on the purchase agreement between DigitalTown and Congo attached hereto as Exhibit 2.

16. I also spent $1,073.65 for work-related travel expenses, but I have never been reimbursed by Congo.

17. I estimate I spent approximately 1,300 of unpaid hours working on projects for Congo.

18. During the period just prior to working full-time for Congo, and throughout my engagement with them, I passed on a number of projects referred to me by friends, business partners, and peers. Monthly revenue per client would range from $5K to $20K, with average engagements running from 6 to 12 months, with 3 to 6 months average contract renewals.

19. I passed on approximately six (6) projects offered by Five Mill, Inc. The monthly income for these projects would be $10k to $15k each, with an average engagement of 6-12 months. Some with overlap and others to start before and after the completion of other projects. I believe that suffered a lost income related to these projects in the amount of $540,000.

20. I also passed on work opportunities from at least three (3) startup companies located in the Bay Area. These opportunities would have generated between $15k and $30k in monthly revenue for a period of six (6) months, with renewals in six (6) month increments. I believe that I have suffered lost income related to these projects in the amount of $150,000.

21. It was also known in my professional circles that I was working full-time with Congo as their Chief Marketing Officer, which also hindered any new client work and income. During my time with Congo, I also did not advertise my business or have an active website, which also deterred generating any new business, income, and growing my own company.

22. Following my termination from Congo, I had to begin rebuilding my business because I had forgone referrals and other business opportunities.

23. I sent a wage demand letter and an offer of compromise to settle my claims on February 14, 2017, attached hereto as Exhibit 3.

24. I obtained a small project for a 90-day work contract in April 2017 and earned $30,000.00.

25. I believe that because Congo failed to perform its obligations under the contract and due to my inability to take on other work at the time I was employed by Congo, I have lost out on approximately $690,000.00 in revenue.

I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 8, 2018.

Michael Balducci

Michael Balducci

# EXHIBIT 1

**CONGO, LTD.**

**EMPLOYMENT AGREEMENT**

**THIS EMPLOYMENT AGREEMENT** (the "*Agreement*") is entered into as of July ___, 2016 (the "*Effective Date*"), by and between **CONGO, LTD.**, a Colorado corporation, with offices at 1035 Pearl St. Suite #100, Boulder, CO 80302 (the "*Company*") and **MICHAEL BALDUCCI**, an individual with a mailing address at 1706 Steiner Street, #3 San Francisco, CA 94115 ("*Executive*").

**WHEREAS**, the business of the Company requires continued direction and leadership in a variety of areas, including, without limitation, operations, management, finance and strategic planning;

**WHEREAS**, Executive's experience and expertise qualifies Executive to provide the direction and leadership required by the Company; and

**WHEREAS**, The Company desires to employ Executive, subject to the terms and conditions set forth herein, and Executive is willing to accept such employment on the terms and conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and conditions below and intending to be legally bound, and the acts to be performed by the parties hereto, the Company and Executive hereby contract and agree as follows:

1. **DEFINITIONS**.

(a) "*Affiliate*" means, as to any Person, any other Person, which directly or indirectly controls, or is under common control with, or is controlled by, such Person or an Affiliate of such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

(b) "*Cause*" means (i) conduct which the Board reasonably believes to be a failure by Executive to substantially perform Executive's duties and responsibilities under this Agreement or otherwise breaches this Agreement which failure or breach is not promptly remedied within 10 days after the Company gives Executive written notice specifying such failure or breach in reasonable detail; (ii) willful misconduct, gross negligence, theft, fraud, or other illegal or dishonest conduct involving the Company, its customers, sellers, purchasers, distributors, vendors, suppliers, service providers or other business relations; (iii) a material violation by Executive of any statutory or common law duty of loyalty to the Company, which is not promptly remedied (if such violation is capable of being remedied) within 10 days after the Company gives Executive written notice specifying such breach in reasonable detail; (iv) unauthorized disclosure of Confidential Information or trade secrets of the Company to competitors of the Company or engaging in competition with the Company; (v) conviction for a felony or other crime involving moral turpitude which reflects badly on the Company in the sole discretion of the Board; (vi) the Executive's violation of a material policy of the Company; or (vii) the Executive's material breach of any obligation under this Agreement or any other written agreement between the Executive and the Company.

(c) "*Code*" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

(d) "*Confidential Information*" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium that relates to the Company or their respective business relations and their respective business activities. Confidential

Information includes, but is not limited to, the following: (i) internal business information (including information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures, accounting and business methods, and identifiable, specific and discrete business opportunities being pursued by the Company); (ii) identities and individual requirements of, and specific contractual arrangements with, the Company's joint venture partners, vendors or customers and other business counter-parties and their confidential information; (iii) trade secrets, know-how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto; (iv) inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether or not patentable), (v) intellectual property rights, and (vi) financial information. Confidential Information does not include information that is generally known to and available for use by the public at the time of disclosure or becomes generally known through no wrongful act on the part of Executive or any other Person having an obligation of confidentiality to the Company or third parties, where applicable.

(e) "Equity Financing" means the closing of at least five hundred thousand dollars ($500,000) worth of proceed received by the Company in a bona fide sale of equity securities to one or more third party purchaser.

(f) "*Good Reason*" means a termination of employment by Executive within six (6) months following the occurrence of (A) a reduction in Executive's Equity Compensation by more than 20% unless such reduction is part of a general reduction in compensation paid by the Company to its management level employees or caused by dilution of the Equity Compensation; (B) a material diminution in Executive's duties, authority, or responsibilities with respect to the Company without Executive's consent; *provided, however*, that a change in Executive's title or reporting relationships absent a material diminution in Executive's duties, authority, or responsibilities with respect to the Company shall not constitute Good Reason; or (C) a failure of the Company to comply with any material provision of this Agreement; *provided*, *however*, that the events described in clauses (A), (B), and (C) above shall not constitute Good Reason (1) until Executive provides written notice to the Company of the existence of such diminution, change, reduction, relocation or failure within thirty (30) days of its occurrence and (2) unless such diminution, change, reduction or failure (as applicable) has not been cured within thirty (30) days after written notice of such noncompliance has been given by Executive to the Company.

(g) "*Permanent Disability*" means the death of Executive or the inability of Executive to perform the essential functions of Executive's job, with or without a reasonable accommodation, through any illness, injury, accident or condition for one hundred twenty (120) days during any period of three hundred sixty-five (365) consecutive calendar days.

(h) "*Person*" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

(i) "*Restrictive Period*" is defined in Section 7(a).

(j) "*Service Status*" means service to the Company or its successors (or any subsidiary) in the capacity of an employee, contractor, consultant, officer, or otherwise.

2. **TERM; EMPLOYMENT FOR CAUSE**.

(a) Executive is employed by the Company for the term of this agreement and shall only be terminated for Cause or shall be terminated in accordance with Section 9 of this Agreement. The term of this Agreement shall be for the duration of Executive's employment with the Company.

(b) Initial Period; Renewal Period. Subject to earlier termination as described herein, the employment of Executive under this Agreement shall begin on the Effective Date and shall continue through and until the firth (5th) anniversary of the Effective Date (the "*Initial Period*") and shall renew automatically after the Initial Period on the anniversary of the Effective Date for additional one (1) year periods (each, a "*Renewal Period*") unless one of the parties shall deliver a written notice of non-renewal to the other party at least sixty (60) days prior to the expiration of the Initial Period or any Renewal Period. The Initial Period and any Renewal Period are collectively hereinafter referred to as the "*Employment Period*." Notwithstanding anything to the contrary contained herein, the Employment Period is subject to earlier termination pursuant to Section 10 below.

3. **EMPLOYMENT; DUTIES**.

(a) The Company agrees to employ Executive and Executive accepts such employment with the Company for the Employment Period, in accordance with the terms and conditions of this Agreement. On the date hereof, Executive shall be appointed Chief Marketing Officer and throughout the Employment Period shall have such duties, authority, responsibilities, and titles as may from time to time be reasonably prescribed by the Company's Chief Executive Officer (the "*CEO*"), the CEO's designee or the Board of Directors of the Company (the "*Board*"), and subject in all cases to the supervision of the CEO or the CEO's designee, including, without limitation, Executive shall serve as a director and/or officer of the Company if so elected or appointed from time to time.

(b) During the Employment Period, Executive shall perform the duties and carry out the responsibilities assigned to Executive to the best of Executive's ability, in a trustworthy, businesslike and efficient manner for the purpose of advancing the business of the Company and shall comply with the Company's lawful policies, practices, and procedures in effect from time to time. Executive acknowledges that Executive's duties and responsibilities hereunder shall require Executive's full business time, reasonable best efforts, skill and knowledge and therefore agrees that, during the Employment Period, Executive will not engage in any other business activity, serve in any industry, trade, professional, government or academic position or have any business interests which may conflict with or impair the performance of any of Executive's duties hereunder or compliance with any of Executive's obligations hereunder, except as may be expressly approved by the CEO or the CEO's designee in writing. Notwithstanding the foregoing or any other provision in this Agreement, it shall not be a breach or violation of this Agreement for Executive to (i) serve on civic or charitable boards or committees; (ii) serve as an independent board member for a for-profit company so long as such position does not present a conflict of interest; or (iii) manage personal investments, so long as the activities described in clauses (i), (ii), and (iii) of this sentence do not, individually or in the aggregate, interfere with or detract from the performance of Executive's responsibilities for the Company in accordance with this Agreement, conflict with the business interests of any member of the Company, or violate Section 7 or 8 of this Agreement.

(c) Executive represents and warrants that Executive is not bound by any noncompetition, non-solicitation or similar agreements or any court order or other legal obligations that would in any manner limit Executive's performance of Executive's duties hereunder or compliance with Executive's obligations hereunder, or Executive's work, effort or activity on behalf of, and while employed by, the Company.

(d) The parties hereby acknowledge and agree that this Agreement shall be deemed to exclusively govern the employment relationship between Executive and the Company and that all other agreements between them purporting to govern such employment relationship are hereby terminated and of no further force or effect as of the date hereof.

4. **COMPENSATION**. The Executive shall receive the following compensation for services provided under this Agreement so long as the Executive maintains continuous Service Status:

(a) Restricted Share Grant. The Executive shall be granted of one hundred and fifty thousand (150,000) restricted shares of the Company's Common Stock ("Shares") equaling one and a half percent (1.5%) of the Shares currently issued and outstanding under the terms of that certain Restricted Share Grant Agreement, hereby attached as Exhibit A, between the Company and the Executive.

(b) Stock Options. After the Effective Date and subject the consummation of a Equity Financing by the Company, the Executive will be granted, subject to the approval of the Board, an option to purchase the following Shares of the then outstanding capital stock of the Company all of which will be on a "pre-money" basis prior to the closing of the Equity Financing under the equity incentive plan to be developed and adopted by the Company and your applicable stock option agreement (the "Pre-money Shares"), which you will be required to sign, and the respective stock options will be fully vested upon completion of the following milestones:

(i) An amount equal to two and a half percent (2.5%) of the Pre-money Shares upon the indexing by Google of two hundred thousand (200,000) or more pages.

(ii) An amount equal to two and a half percent (2.5%) of the Pre-money Shares upon the Company's having three (3) consecutive months of more than one hundred thousand dollars ($100,000) in monthly recurring revenue, or the Equity Financing.

(iii) An amount equal to two and a half percent (2.5%) of the Pre-money Shares upon the Company's having three (3) months of more than one million dollars ($1,000,000) in total monthly revenue.

(iv) An amount equal to six percent (6%) of the Pre-money Shares subject to a four (4) year vesting schedule beginning on the closing of a qualified financing of at least $500,000, with monthly vesting.

5. **BENEFITS**. Executive shall be entitled to participate in the Company's health insurance plan, vacations, holiday leave, sick leave and fringe benefits normally offered to executive employees of the Company in accordance with the then-current policies and procedures of the Company and subject to eligibility requirements of such benefit plans. The Company retains the right to modify, add or eliminate such policies and procedures from time to time at its sole discretion. The amount of premiums paid by the Company under its health insurance plan shall be treated as taxable income to Executive if the provision of such benefits on a non-taxable basis would subject to Executive to tax on the benefits received under Section 105(h) of the Code.

6. **CONFIDENTIAL INFORMATION.**

(a) Confidential Information. Executive acknowledges that the members of the Company continually develop Confidential Information, that Executive may develop Confidential Information for the Company, and that Executive may learn of Confidential Information during the course of the Employment Period. Executive agrees that all Confidential Information which Executive creates or to which Executive has access as a result of Executive's employment with the Company is and shall remain the sole and exclusive property of the Company, where applicable, including such information concerning acquisition opportunities in the Company's business or industry of which Executive becomes aware. Executive will comply with the policies and procedures of the Company for protecting Confidential Information and shall not (and shall cause each of Executive's Affiliates not to) at any time (whether during or after the Employment Period) disclose to any unauthorized person or, directly or indirectly, use for Executive's own account, benefit, or gain, any of such Confidential Information without the Board's prior written consent. Executive agrees to deliver to the applicable member or members of the Company at the time of termination

of Executive's employment with the Company, or at any other time any member of the Company may request in writing (whether during or after the Employment Period), all memoranda, notes, plans, records, reports and other documents, regardless of the format or media (and copies thereof), relating to the business of the Company and its and their respective predecessors (including, without limitation, all acquisition prospects, lists and contact information) which Executive may then possess or have under Executive's control.

(b) Third Party Information. Executive understands that the Company will receive confidential or proprietary information relating to the business or prospective business of third parties ("*Third Party Information*") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the Employment Period and thereafter, and without in any way limiting the provisions of Section 7(a) above, Executive will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than personnel of the Company who need to know such information in connection with their work for the Company) or use, except in connection with Executive's work for the Company, Third Party Information unless expressly authorized by a member of the Board in writing.

(c) Documents. All documents, records, tapes and other media of every kind and description relating to the business, present or otherwise, of the Company and any copies (including, without limitation, electronic copies), in whole or in part, thereof (the "*Documents*"), whether or not prepared by Executive, shall be the sole and exclusive property of the Company. Except as required for the proper performance of Executive's duties for the Company or as expressly authorized in writing in advance by the Company, Executive will not copy any Documents or remove any Documents or copies or derivatives thereof from the premises of the Company. Executive shall safeguard all Documents and shall surrender to the Company at the time Executive's employment terminates, or at such earlier time or times as the Board or its designee may specify, all Documents and other property of the Company then in Executive's possession or control. Executive further agrees to disclose to the Company at the time Executive's employment terminates, or at such earlier time or times as the Board or its designee may specify, all passwords necessary or desirable to obtain access to, or that would assist in obtaining access to, any information which Executive has password-protected on any computer equipment, network or system of any member of the Company.

(d) Use of Information of Prior the Company. During the Employment Period, Executive will not improperly use or disclose any Confidential Information, if any, of any former employers or any other Person to whom Executive has an obligation of confidentiality, and will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other Person to whom Executive has an obligation of confidentiality with respect to such unpublished documents or property unless consented to in writing by the former employer or Person. For the avoidance of doubt, this Section 6(d) does not apply to predecessors of the Company or of its Affiliates.

(e) Disclosure of Information through the Legal Processes. Executive agrees to furnish prompt notice to the Company of any required disclosure of Confidential Information or Third Party Information sought pursuant to subpoena, court order, or any other legal process or requirement, and agrees to provide the Company a reasonable opportunity to seek protection of the Confidential Information or Third Party Information prior to any such disclosure. In the event that (i) no such protection is obtained or (ii) the Company waives Executive's obligations to comply with the terms of this Section 6 for this specific purpose, Executive will furnish only that portion of the Confidential Information or Third Party Information which Executive or Executive's representatives are advised in writing or orally by counsel to the Company is legally required and will exercise reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Confidential Information or Third-Party Information.

7. **RESTRICTIVE COVENANTS.** Executive acknowledges that (i) during the course of Executive's employment with the Company, Executive will become familiar with the Company's trade secrets and with other Confidential Information and that Executive's services shall be of special and unique

value to the Company, (ii) under certain circumstances, the Company's loss of Executive's employment services, or a Company competitor's receipt of his services, may result in the unauthorized disclosure of Confidential Information (including, without limitation, trade secrets), misappropriation of the Intellectual Property and/or unfair competition with the Company, which may cause irreparable harm to the Company (as referenced in C.R.S. § 8-2-113(2)(b)); (iv) Executive is a member of the "executive and management personnel" of the Company (as such phrase is used in C.R.S. § 8-2-113(2)(d)); and (v) Executive possesses and will possess knowledge, skills and reputation related the Company's business that are of material importance to the Company and are special, unique and extraordinary. Therefore, Executive agrees that the following restrictions on Executive's activities during employment and for a period of time after Executive's employment are necessary to protect the good will, Confidential Information, Intellectual Property and other legitimate interests of the Company:

(a) Non-solicitation. During the Restrictive Period, Executive shall not (and shall cause all of Executive's Affiliates not to) directly or indirectly through another entity or person (i) encourage, induce or attempt to encourage or induce any employee or independent contractor of any member of the Company to leave the employ or engagement of the Company, or in any way interfere with the relationship between the Company and any employee or independent contractor thereof, (ii) hire (in any capacity) any person who was employed or engaged by any member of the Company at any time during the twelve (12) month period immediately prior to the date on which such hiring would take place (it being conclusively presumed by the parties hereto so as to avoid any disputes under this Section 7(b) that any such hiring within such twelve (12) month period is in violation of clause (i) above), (iii) call on, solicit or provide services to any customer, client, supplier, vendor, distributor, product manufacturer, licensee, licensor or other business counter-party of any member of the Company in order to encourage or induce or attempt to encourage or induce such Person to cease or curtail doing business with the Company, or in any way interfere with the relationship between any such customer, client, supplier, vendor, distributor, product manufacturer, licensee, licensor or business counter-party and the Company (including making any negative or disparaging statements or communications about the Company), (iv) initiate or engage in any discussions regarding an acquisition of any businesses relating to the business of the Company or any business which, with Executive's participation, is under active consideration by the Company during Executive's employment with or services to the Company, (v) disclose to any other person or entity the names of past or present clients, customers, sellers, purchasers or vendors of the Company, except in the ordinary course of business during the term of this Agreement in connection with performing services to the Company under this Agreement. Subject to the foregoing, the parties hereto agree that the names of such clients, customers, sellers, purchasers or vendors, as well as any processes or software that has been implemented by the Company, are confidential and proprietary and constitute trade secrets of the Company within the meaning of C.R.S. § 8-2-113(2)(b) and C.R.S. § 7-74-102(4).

(b) No Conflict of Interest. Executive agrees that, during Executive's employment with the Company, except as expressly set forth in this Agreement, Executive will not undertake any outside activity, whether or not competitive with the business of any member of the Company that could reasonably give rise to a conflict of interest or otherwise interfere with Executive's duties and obligations to the Company.

(c) Non-Disparagement. Executive agrees that Executive will not disparage any members of the Company, or any of their respective management, products or services. This restriction shall continue to apply following the termination of Executive's employment, regardless of the reason therefor. Following such termination of Executive's employment, the Company agrees (i) that the Company will not disparage Executive in authorized corporate communications to third parties and (ii) to instruct the senior executives and officers of the Company not to disparage Executive to third parties.

8. **EQUITABLE RELIEF**. Executive acknowledges and agrees that the restrictions contained in Sections 6 and 7 above are (a) reasonable and necessary to protect the legitimate interests of the Company, (b) valid in geographical and temporal scope and in all other respects, and (c) essential to protect the value of the business of the Company and its assets, and that Executive's violation or default

under such sections will result in irreparable injury to the Company. Executive therefore acknowledges and agrees that the Company may be entitled to specific performance of the provisions set forth in Sections 6 and 7 above and to preliminary and permanent injunctive relief relating thereto, which rights shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled. The Company shall not be required to post a bond or to show special damages in any proceeding seeking any such equitable relief.

9. **TERMINATION**.

(a) The Board, by majority consent, shall have the right to terminate this Agreement and Executive's employment at any time for (i) Cause, provided that Executive fails to cure such Cause (if such Cause is capable of cure) within ten (10) days after receipt of written notice of the same from the Company or (ii) due to the Permanent Disability of Executive.

(b) Executive shall have the right to terminate this Agreement and Executive's employment at any time for Good Reason provided that the Company fails to cure such Good Reason (if such Good Reason is capable of cure). In addition, Executive may resign from employment hereunder at any time without Good Reason, *provided*, *however*, that (i) Executive shall give ninety (60) days' written notice to the Company prior to the effectiveness of any such resignation, (ii) such resignation shall not be effective until the expiration of such notice period unless all or part of such notice period is waived in writing by the Company in which case such resignation shall be effective as of the date of such waiver, (iii) Executive shall use good faith efforts during the notice period to identify and recruit a replacement for Executive reasonably suitable to the Company, and (iv) the Executive shall no longer be entitled to any compensation under Section 4 of this Agreement if Executive does not maintain Service Status for any reason or if the Executive terminates this Agreement for Good Reason.

(c) For the avoidance of doubt, no provision of this Agreement or any other agreement between Executive and any member of the Company shall confer upon Executive any right to continue in the service of the Company (or any other member of the Company) for any period of time or interfere with or restrict in any way the rights of the Company (or any other member of the Company), which rights are hereby expressly reserved by the Company (or any other member of the Company), to terminate Executive's employment at any time, for Cause.

10. **TAXES**. Executive shall be responsible for the payment of any and all taxes due or to come due with respect to any and all compensation and benefits Executive receives from the Company or otherwise pursuant to this Agreement. Executive acknowledges and agrees that the Company has not made and does not make any representations about the tax consequences with respect to any compensation and other benefits Executive receives from the Company pursuant to this Agreement or otherwise.

11. **NOTICES**. All notices or other instruments or communications provided for in this Agreement shall be in writing and signed by the party giving same and shall be deemed properly given if delivered via email and confirmed as received. Each party may, by notice to the other party, specify any other address for the receipt of such notices, instruments or communications.

12. **ASSIGNMENT**. Neither the Company nor Executive may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other party; *provided*, *however*, that the Company may assign its respective rights and obligations under this Agreement without the consent of Executive (i) to any of its Affiliates or successors, (ii) to any of its lenders, or (iii) in the event that the Company shall hereafter affect a reorganization, consolidate with, or merge into, any other Person or transfer all or substantially all of its properties, stock, or assets to any other Person, then to such Person. Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by Company and Executive and their respective successors and assigns.

13. **GOVERNING LAW; VENUE; JURISDICTION; JURY TRIAL WAIVER**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Colorado without giving effect to any choice or conflict of law provision or rule (whether of the State of Colorado or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Colorado. The parties agree that any action or proceeding commenced under or with respect to this Agreement shall be brought only in Colorado state courts of the county or district courts of Boulder, Colorado or the federal district courts of the District of Colorado located in Denver, and the parties irrevocably consent to the personal jurisdiction of such courts and waive any right to alter or change venue, including by removal. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. **THE PARTIES HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO OR IN CONNECTION WITH THIS AGREEMENT.**

14. **ENTIRE AGREEMENT; SEVERABILITY; AMENDMENTS; WAIVER**. This Agreement constitutes the entire agreement between the parties hereto concerning the matters covered herein and supersedes all prior agreements and/or understandings between the parties, whether written or oral, concerning the matters addressed herein. In the event that any of the terms of this Agreement are or become illegal or unenforceable, such terms shall be deemed revised so as to become enforceable while remaining as close as possible to the intent of such terms as originally written, and all of the remaining terms of this Agreement shall remain in full force and effect. Except as otherwise expressly provided herein, the terms of this Agreement may be amended only with the prior written consent and authorization of Executive and the Board. No waiver of any provision of this Agreement, nor consent to any departure by either party therefrom, shall in any event be effective unless the same shall be in writing and signed by Executive and approved by the Board, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

15. **SURVIVAL**. Notwithstanding anything to the contrary herein, Sections 7 through 15 above and this Section 16 shall survive any expiration or termination of this Agreement.

16. **COUNTERPARTS**. This Agreement may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Executive Employment Agreement effective as of the Effective Date.

**THE COMPANY: CONGO, LTD.**

By: Willy Ogorzaly

Name: William Henry Ogorzaly

Title: Chief Executive Officer

**EXECUTIVE:**

Michael Balducci

**NAME: MICHAEL BALDUCCI**

**Exhibit A**

**Restricted Share Grant Agreement**

# RESTRICTED SHARE GRANT AGREEMENT

This Restricted Share Grant Agreement (this "Agreement") is made and entered into as of July 19, 2016 (the "Grant Date") by and between Congo, Ltd., a Colorado corporation (the "Company") and Michael Balducci (the "Holder").

1. **Grant of Common Shares.** The Company hereby grants to the Holder 150,000 Shares of Common Stock (the "Shares") in consideration for Holder's services under that certain Employment Agreement, as amended, by and between the Company and Holder, at a value of $.0012 per Share. By executing this Agreement, the Holder hereby accepts the Shares subject to all of the terms and provisions of this Agreement and the LLC Agreement. From time to time, the Board may elect to grant and issue additional shares to new or existing service providers or equity holders, in the Board's discretion. Holder acknowledges and agrees that such grants may result in the dilution of Holder's proportional interest in such unit classes and the Company as a whole.

2. **Section 83(b) Election; Taxes Generally.** If the Holder intends to make an election with the Internal Revenue Service under Section 83(b) of the Code, the Holder shall make such election within thirty (30) days following the Grant Date, in the form attached hereto as Exhibit A, and shall promptly provide a copy to the Company. Holder represents that it has received tax advice from its own personal tax advisor on the tax consequences of receiving a grant of the Shares. The Holder understands the tax consequences of filing (and not filing) a Section 83(b) election under the Internal Revenue Code of 1986, as amended (the "Code"). The filing of a Section 83(b) election is the Holder's sole responsibility. Further, any and all tax liability incurred by Holder as a consequence of the grant hereunder is solely the responsibility of Holder.

3. **409A Acknowledgement.** Holder understands and acknowledges that payments under this Agreement are potentially subject to Section 409A of the Code and that if this Agreement does not satisfy an exception to Code Section 409A or does not comply with the requirements of Section 409A and the applicable guidance thereunder, then Holder may incur adverse tax consequences under Section 409A. Holder further agrees that Holder has read, understands, and will execute and submit to the Company an executed copy of the 409A Acknowledgement and Release (the "409A Acknowledgement"), attached hereto as Exhibit B.

4. **Vesting.** The Shares shall vest in accordance with the below vesting schedule, subject to the Holder's continued Service with the Company or any Company Subsidiary or affiliate through the applicable vesting dates. The Shares that have become vested pursuant this vesting schedule are referred to herein as "Unrestricted Shares" and the Shares which are not vested are referred to herein as "Restricted Shares." 100% of the Shares shall initially be Restricted Shares and vest as follows:

   a. Vesting Milestones. The Restricted Shares shall vest and become Unrestricted Shares in accordance with the schedule and Service Obligations listed on Exhibit C hereto until all Shares are released from the Repurchase Option (provided in each case that Holder maintains continual Service Status as defined in the Executive Employment Agreement).

b. Forfeiture. In the event there is a termination of Service, the Holder will automatically forfeit all of the then unvested Restricted Shares without any further action by either party as of the termination date and without consideration therefor.

c. Rights of Holder. Subject to the provisions herein and in the LLC Agreement, Holder shall exercise all rights and privileges of a Common Stock holder with respect to the Shares granted hereunder without regard to the vesting restrictions contained herein. Holder shall be deemed to be the holder for purposes of receiving any distributions or allocations that may be paid with respect to such Shares, even if some or all of the Shares have not yet vested.

d. Acceleration Condition. Notwithstanding the foregoing vesting schedule, if a Change in Controls occurs, all then unvested Restricted Shares shall automatically accelerate and become 100% vested as of the date of the Change in Control; provided that Holder's Service has not been terminated prior to the Change in Control.

e. Certain Definitions.

i. "Service" shall mean employment by or the provision of services to the Company or a parent or subsidiary thereof as an advisor, officer, consultant or member of the Board of Directors.

ii. "Change in Control" shall mean the sale of all or substantially all of the outstanding shares of capital stock, assets or business of the Company, by merger, consolidation, sale of assets or otherwise (other than a merger or consolidation in which all or substantially all of the individuals and entities who were beneficial owners of the Company's voting securities immediately prior to such transaction beneficially own, directly or indirectly, more than 75% (determined on an as-converted basis) of the outstanding securities entitled to vote generally in the election of directors of the resulting, surviving or acquiring corporation in such transaction); *provided that* a Change in Control shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof.

5. **Restrictions on Transfer.** None of the Shares may be conveyed, pledged, assigned, transferred, hypothecated, encumbered or otherwise disposed of by the Holder or any transferee, except as expressly provided in the LLC Agreement.

6. **Representations and Warranties.** The Holder hereby makes the following representations, warranties and agreements with respect to the Shares:

a. Restrictions. The Holder understands and agrees that the Shares are being sold or granted in a transaction not involving any public offering in the United States within the meaning of the Securities Act of 1933, as amended (the "Securities Act") and that the Shares will not be

registered under the Securities Act or any state or foreign securities or "blue sky" laws and that it is anticipated that there will be no public market for the Shares. The Holder understands and agrees that the Company is under no obligation to file any registration statement with the Securities and Exchange Commission in order to permit transfers of the Shares.

b. Nature of Holder. The Holder's knowledge and experience in financial and business matters are such that the Holder is capable of evaluating the merits and risks of the investment in the Shares. The Holder understands that the Shares are a speculative investment which involves a high degree of risk of loss of the Holder's investment therein. It may not be possible for the Holder to liquidate his or her investment in case of emergency, if at all. The Holder is able to bear the economic risk of an investment in the Shares, including the risk of a complete loss of his or her investment.

c. Purchase for Investment. The Holder is acquiring the Shares for his or her own account for investment purposes and not with a view to, or for offer or sale on behalf of himself or herself or for the Company in connection with, the distribution or resale thereof.

d. Receipt of, Access to and Reliance on Information. The Holder acknowledges that (i) the Company has given him or her, at a reasonable time prior to the Grant Date, an opportunity to ask questions and receive answers regarding the terms and conditions of the Bylaws and this Agreement; (ii) the Company has given him or her, at a reasonable time prior to the date hereof, an opportunity to obtain any additional information that the Company possesses or can acquire without unreasonable effort or expense deemed necessary by him or her to verify the accuracy of the information provided, and he or she received all such additional information requested; and (iii) he or she has not relied on any of the Company or any of its "affiliates" (as defined in Regulation D of the Securities Exchange Act of 1934, as amended), officers, employees or representatives in connection with his or her investigation of the accuracy of the information provided or his or her investment decision. The Holder acknowledges that no person has been authorized to give any information or to make any representations concerning the Shares, written or oral, that does not conform to the information included in the Bylaws or this Agreement and if given or made, such other information or representation should not be relied upon as having been authorized by any of the Company or any of its respective affiliates, officers, employees or representatives.

e. No Misrepresentation; Notification of Any Change. The Holder understands that the Company and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and warranties, and agrees that if any of the acknowledgements, representations and warranties deemed to have been made by it upon its acquisition of the Shares are no longer accurate at any time, it shall promptly notify the Company.

f. State of Residence. The Holder is a resident of the state set forth below the Holder's signature to this Agreement. The Holder shall notify the Company of any change in his or her residence on or prior to the date of such change.

7. **Bylaws; Joinder.** The Holder (for the Holder and for any of the Holder's transferees) hereby agrees to be bound by, and subject to, all of the terms and provisions of the Bylaws, including all restrictions on the transfer of the Shares, and agrees to be subject to the Bylaws in connection with this grant.

8. **Legend.** Any certificate(s), if any, representing the Shares will bear a legend substantially as in the Bylaws, and the Holder will not make any transfer of the Shares without first complying with the restrictions described in such legend. The Holder agrees that the Company may also endorse any other legends required by applicable federal or state securities laws.

9. **No Right to Continued Service.** This Agreement shall not confer upon the Holder any right to be retained in any position, as an officer, employee, or consultant of the Company. Further, nothing in this Agreement shall be construed to limit the discretion of the Company to terminate the Holder's employment or service at any time, with or without cause.

10. **Withholding.** The Company may require the Holder to make payment to the Company to enable it to meet any withholding obligations that may be associated with the Shares.

11. **Notices.** Any notice or other communication under this Agreement shall be in writing and shall be deemed to have been given if delivered personally or by registered or certified mail, postage prepaid, addressed to the recipient at the last known address of the recipient. Either party may designate another address in writing (or by such other method approved by the Company) from time to time.

12. **Governing Law.** This Agreement will be construed and interpreted in accordance with the laws of the State of Colorado without regard to conflict of law principles.

13. **Interpretation.** Any dispute regarding the interpretation of this Agreement shall be submitted by the Holder or the Company to the Board for review. The resolution of such dispute by the Board shall be final and binding on the Holder and the Company.

14. **Integration.** This Agreement and the Bylaws contain the entire understanding of the parties with respect to the subject matter hereof. This Agreement and the Bylaws supersede all prior agreements and understandings between the parties with respect to such subject matter.

15. **Successors.** This Agreement shall be binding upon and inure to the benefit of the heirs, legal representatives, successors and permitted assigns of the parties.

16. **Severability.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, and each provision of this Agreement shall be severable and enforceable to the extent permitted by law.

17. **No Impact on Other Benefits.** Except as specifically provided in a retirement or other benefit plan of the Company or a Company Subsidiary, the Shares are not part of the Holder's normal or expected compensation for purposes of computing benefits or contributions under any retirement or other employee benefit plan.

18. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. Counterpart signature pages to this Agreement transmitted by facsimile transmission, by electronic mail in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing an original signature.

* * * * *

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Grant Date written above.

COMPANY:

By: Willy Ogorzaly

Name: William Henry Ogorzaly

Title: CEO

HOLDER:

Michael Balducci

(Signature)

Name: Michael Balducci

Address: 1706 Steiner Street, #3

San Francisco, CA 94115

## EXHIBIT A:

## FORM OF 83(B) ELECTION

**IF YOU WISH TO MAKE A SECTION 83(B) ELECTION, THE FILING OF SUCH ELECTION IS SOLELY YOUR RESPONSIBILITY. THE FORM FOR MAKING THIS SECTION 83(B) ELECTION IS ATTACHED TO THIS AGREEMENT FOR YOUR CONVENIENCE ONLY.**

**YOU MUST FILE THIS FORM WITHIN 30 DAYS OF RECEIVING THE SHARES TO MAKE THE ELECTION.**

**FAILURE TO FILE WITHIN THAT TIME WILL RENDER THE ELECTION VOID AND YOU MAY RECOGNIZE ORDINARY TAXABLE INCOME AS YOUR VESTING RESTRICTIONS LAPSE.**

**CONGO, LTD. AND ITS COUNSEL CANNOT ASSUME RESPONSIBILITY FOR FAILURE TO FILE THE ELECTION IN A TIMELY MANNER UNDER ANY CIRCUMSTANCES**

# SECTION 83(B) ELECTION

______________, 2016

Director of Internal Revenue
Internal Revenue Service Center
**Fresno, CA 93888**[1]

Re: Election Under Section 83(b)

This statement constitutes an election pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended from time to time. Pursuant to Treasury Regulations Section 1.83-2, the following information is submitted:

**1.** **Name:** ________________________ (“***Holder***”)

**Address:** ________________________

________________________

**Social Security No.:** ________________________

**Property Description:** 150,000 Common Shares (the “***Shares***”) of Congo, Ltd. (the “***Company***”).

**2.** The date on which the Shares was acquired is ________________.

**3.** The taxable year for which the election is made is the calendar year ______.

**4.** **Restrictions:** if, on or before ________, 20__ the services of Holder to the Company terminate for any reason, Holder shall forfeit some or all of the property.

**5.** The fair market value at the time of transfer of the Shares, determined without regard to any restriction other than a restriction which by its terms will never lapse, is $180.00.

**6.** The amount paid by the undersigned taxpayer for the property is $180.00.

**7.** A copy of this statement has been furnished to the Company and the transferee of the property if different from Holder.

________________________

Michael Balducci

Confidential Document

**EXHIBIT B:**

**Section 409A Acknowledgement and Release.**

Holder understands that payments under this Agreement are potentially subject to Section 409A of the Code and that if this Agreement does not satisfy an exception to Code Section 409A or does not comply with the requirements of Section 409A and the applicable guidance thereunder, then Holder may incur adverse tax consequences under Section 409A. Holder acknowledges and agrees that (a) Holder is solely responsible for all obligations arising as a result of the tax consequences associated with payments under this Agreement including, without limitation, any taxes, interest or penalties associated with Section 409A, (b) Holder is not relying upon any written or oral statement or representation by the Company or any Affiliate thereof, or any of their respective employees, directors, officers, attorneys or agents (collectively, the "Company Parties") regarding the tax effects associated with the execution of this Agreement and the payment under this Agreement, and (c) in deciding to enter into this Agreement, Holder is relying on his or her own judgment and the judgment of the professionals of his or her choice with whom Holder has consulted. Holder hereby releases, acquits and forever discharges the Company Parties from all actions, causes of actions, suits, debts, obligations, liabilities, claims, damages, losses, costs and expenses of any nature whatsoever, known or unknown, on account of, arising out of, or in any way related to the tax effects associated with the execution of this Agreement and any payment hereunder.

Dated: ________________

**HOLDER:**

Michael Balducci

___________________________ ☐

(Signature)

1706 Steiner Street, #3 San Francisco, CA 94115

## EXHIBIT C

### SERVICE OBLIGATIONS OF HOLDER

The Repurchase Option shall lapse with respect to 100% of Shares of the Stock once the Holder has delivered tables for the search engine journaling infrastructure with wireframes for 200,000 or more pages.

# EXHIBIT 2

# AGREEMENT FOR PURCHASE AND SALE OF ASSETS

THIS AGREEMENT FOR PURCHASE AND SALE OF ASSETS (this "Agreement") is made and entered into as of the 9th day of October, 2017, by and among DigitalTown, Inc., a Delaware corporation ("Buyer"), and Congo Ltd., a Colorado corporation ("Seller").

## RECITALS

A. Seller owns and operates a web-based online platform offering: 1) a portal connecting attorneys to prospective clients through a marketplace setting; 2) a software as a service subscription, selling web features to attorneys for their use on their respective law firm websites; and 3) the creation of customized online directories.

B. Seller desires to sell certain Assets to Buyer. All Assets subject to sale are set forth in Exhibit A. Buyer desires to purchase the Assets from the Seller, all on the following terms and conditions.

NOW, THEREFORE, in consideration of mutual covenants, agreements and considerations set forth herein, the parties agree as follows:

1. Purchase and Sale.

1.1 Assets. On and subject to the terms and conditions of this Agreement, Buyer agrees to purchase the Assets from Seller and Seller agrees to sell the Assets to Buyer on the Closing Date (as hereinafter defined).

1.2 Purchase Price. The purchase price for the Assets shall be one million two hundred seventy-five thousand and no/100 US Dollars ($1,200,000) ("Purchase Price") payable upon Closing and as follows:

(a) $1,200,000 of the Purchase Price shall be paid in Buyer's publicly issued common stock ("Shares") valued at forty cents ($0.40) per share on the Closing Date, in total, three million (3,000,000) Shares.

(b) $75,000 of the Purchase Price shall be paid in cash, to be wired on the Closing Date.

1.3 Obligations of Seller.

(a) All liabilities of Seller, whether disclosed or undisclosed, including year-end adjustments to the extent said adjustments relate to any period of time prior to the Closing Date shall be paid by Seller and Seller shall indemnify and hold Buyer harmless against all such liabilities, including all tax liabilities. Except as otherwise specifically provided herein, Buyer shall assume no liabilities or obligations of Seller.

(b) Prior to the Closing Date, Seller agrees to provide to Buyer all information necessary to transfer the Assets to Buyer on the Closing Date and Seller further agrees to execute any documents required to effect such transfer.

(c) In consideration of the Purchase Price and for entering into this Agreement, Seller warrants that until Closing or termination of this Agreement, it shall not engage in any discussions with other potential acquirers and will dedicate all resources as needed, in good faith, to proceed toward the Closing of the transaction.

1.4 Obligations of Buyer.

(a) Buyer is not assuming or agreeing to assume or discharge, and shall not be liable for, any liability or obligation of Seller whatsoever, whether now existing or hereafter incurred, other than (i) the obligations of Seller arising from this Agreement and after the Closing Date to maintain the transferred Assets. Seller shall remain responsible for and shall pay when due, all other liabilities and obligations of Seller, whether now existing or hereafter.

(b) As a condition of entering into this Agreement, Buyer shall make an offer of employment to Frank Robles. Obligations for such employment, salary and benefits, shall be paid by Buyer immediately, commencing October 6__, 2017.

(c) Buyer immediately grants to Seller a non-exclusive right to sell and license the got.law and city.law web domains (i.e. austin.law, clevelend.law, etc.) until Closing, except the Seller shall have an exclusive right to sell domain names associated with austin.law and cleveland.law, with all proceeds of such sales or licenses and contracts belonging to Seller until such time as the Closing occurs. Such right shall be documented in a separate licensing agreement between Buyer and Seller.

1.6 Earnest Money. Buyer shall deliver to Seller, prior to closing, fifty thousand and no/100 US Dollars ($50,000), payable in two installments, the first being October 10__, 2017 and

DocuSign Envelope ID: 59182CF0-17D5-4735-885E-2AD3ADA1B922

the second on November 6__, 2017. The foregoing payment shall be deemed non-refundable earnest money in anticipation of the Closing. Earnest money shall be used by Seller to continue operations up to and through the Closing Date.

2. The Closing. The transaction provided for herein shall be closed on the first available date mutually agreed upon by the parties after the condition specified in Section 7(a) herein has been satisfied (the "Closing Date"), with the intention to close on or before December 5, 2017. The closing shall be facilitated by overnight delivery of documents and by wire transfer of funds, transfer of stock, or by such other means as the parties may agree upon. In the event the condition set forth in Section 7(b) herein has not been satisfied prior to December 5th, 2017, either party may terminate this Agreement immediately upon written notice to the other party.

3. Instruments of Transfer; Further Assurances.

(a) At the Closing, the Seller shall deliver to Buyer:

(i) A Bill of Sale and Assignment(s) transferring to Buyer ownership of the Assets free and clear of all liens, security interests and other encumbrances;

(ii) A Certificate of Good Standing for Seller from the Colorado Secretary of State;

(iii) Certified resolutions of the Board of Directors of Seller approving this transaction;

(iv) A Non-Competition Agreement pursuant to Section 9 herein, duly executed by Seller.

(v) Such other and further instruments of transfer as shall in the opinion of Buyer's counsel be necessary or appropriate to consummate the purchase and sale.

(vi) Offers of employment to Victor Rojas, Fernando Guerrero and Luis Fernando Valenzuela Peinado. Unless an agreement is entered into between any of said employees and the Buyer, these employees will be considered at will, and their employment may be terminated at any time.

(b) At the Closing, Buyer shall deliver the Purchase Price to Seller in the amounts as set forth in Section 1.2 herein with the exception of 750,000 Shares which shall be held by Buyer in escrow, to be released no later than one hundred and twenty (120) days after the Closing Date. In the event a creditor of Seller asserts a claim against the Buyer, the Buyer may reduce an amount of Shares held in escrow equal to the value of the claim If the value of the claim is less than the value of the Shares held in escrow, the Buyer will then transfer to Seller the number of shares that is in excess to the value of the claim.

4. Representations and Warranties of Seller and Seller's Shareholders. Seller represents and warrant to Buyer as follows:

(a) Organization; Good Standing. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Colorado with all requisite power and authority to perform its obligations hereunder.

(b) Authorization. The execution, delivery and performance of this Agreement by Seller has been duly authorized by the Board of Directors of Seller and the Agreement constitutes the valid and binding obligations of Seller.

(c) Financial Statements. Seller shall deliver to Buyer copies of the following internally prepared financial statements of Seller ("Financial Statements"), all of which are true and complete:

(i) Balance Sheet of Seller for the period ended November 30, 2017.

(ii) Statement of Income for January 1, 2017 through November 30, 2017.

The Financial Statements fairly present the financial condition and assets and liabilities of Seller as of the date indicated, and the results of operations of Seller for the period then ended. The Financial Statements were prepared accurately and on a basis consistent with the Financial Statements of Seller prepared in previous years.

(d) Absence of Undisclosed Liabilities. Except to the extent reflected, reserved, or otherwise provided for in the Financial Statements, Seller does not have any liabilities or obligations of any nature relating to the operations or business conducted, whether accrued, absolute, contingent or otherwise, and whether due or to become due, other than those incurred

DocuSign Envelope ID: 59182CF0-17D5-4735-885E-2AD3ADA1B922

in the ordinary course of business. There is no basis for assertion against Seller of any claim or liability relating to said operations or business in any amount not fully reflected or provided for in the Financial Statements or covered by insurance policies of Seller.

(e) No Adverse Changes. There have not been (i) any adverse changes in the financial condition or in the operations, business, prospects, properties or Assets from that shown on the Financial Statements, or (ii) any damage, destruction or loss to any of the properties or Assets, whether or not covered by insurance, which have adversely affected or impaired or which does or may adversely affect or impair the ability of Seller to conduct its business, or (iii) any negotiation, or request for negotiation, for any representation or any labor contract or any event or condition relating to Seller's business of any character which has adversely affected or which does or may adversely affect or impair the business of Seller.

(f) Tax Returns and Payments. Except for returns which are not yet due (provided they are filed on or prior to their due date), Seller will have at Closing duly filed all federal, state and local tax returns and reports required to be filed and now have and will have at Closing fully paid or established adequate reserves for the proper payment of all taxes (whether or not shown on any tax return) and other governmental charges upon it or its properties, assets, licenses or sales (excluding income taxes based on Seller's net income). There are no tax rulings outstanding, or requested rulings, that would affect any of Seller's tax liabilities. All monies required to be withheld by Seller from employees for income taxes, Social Security and unemployment insurance taxes have been collected or withheld, and either paid to the respective governmental agencies or set aside in accounts for such purpose, or accrued, reserved against, and entered upon the books of Seller. Any and all Internal Revenue Service adjustments to Seller's taxes have been reported to all applicable states and all state taxes relating to such adjustments have been paid.

(g) Title to Property and Assets. Seller has good title to all its Assets, subject to no mortgage, pledge, lien, security interest, Leases, charge, encumbrance or conditional sale or other title retention agreement.

(h) Leases and Licenses. A list of all leases and all license agreements to which Seller is a party, and related to the Assets is attached as Schedule B. All such leases and licenses are in good standing, valid and effective in accordance with their respective terms, and there are

no existing defaults or events of default or events which with notice or lapse of time or both would constitute defaults. Seller has received no notice of any claimed default with respect to any leases and licenses. Neither the execution of this Agreement nor the consummation of the transaction contemplated by this Agreement will result in a default in, or will be deemed to be an assignment of, Seller's leases and licenses.

(i) Litigation, etc. Other than the matter of Michael Balducci vs. Congo Ltd. filed in California Superior Court and removed to the United States District Court, District of Colorado, Case No. 4:14-cv-4062-KAW, there is no suit, action or litigation, or administrative, arbitration or other proceeding at law or in equity (including but not limited to, those that are filed but un-served), or threatened in writing against the Seller, and Seller has not received any written notice of any such threatened action, suit, arbitration, claim, audit or proceeding or, any governmental investigation or any change in the environmental, zoning or building laws, regulations or ordinances affecting the real property or leasehold property of Seller or its business operations, pending or, to the knowledge of Seller or Seller's Shareholders, threatened, that might, severally or in the aggregate, adversely affect the financial condition, business, property, assets or prospects of Seller. Seller has complied with and is not in default under or in violation of any laws, ordinances, requirements, regulations or orders applicable to its business and Seller has not received notice of any claimed default or violation with respect to any of the foregoing which claimed default or violation exists as of the date of this Agreement. In the event any action, suit, arbitration, claim or proceeding of the nature described in this Section is initiated prior to Closing, Seller shall advise Buyer thereof in writing within five (5) business days.

(j) Compliance with Other Instruments, etc. Neither the execution nor the delivery of this Agreement nor the consummation of the transaction contemplated hereby will conflict with or result in any violation of or constitute a default under any agreements of Seller or Seller's Shareholders, or any agreement, mortgage, indenture, license, permit or other instrument, judgment, decree, order, law or regulation by which Seller or Seller's Shareholders is bound.

DocuSign Envelope ID: 59182CF0-17D5-4735-885E-2AD3ADA1B922

(k) Books of Account and Records. Seller's books of account fairly reflect all of the Seller's items of income and expense, assets, liabilities and accruals, and are prepared, maintained and compiled on a basis consistent with prior years.

(l) Brokers. No broker or finder has been employed by Seller or Seller's Shareholders in connection with this transaction.

(m) Disclosure. No representation or warranty by the Seller's Shareholders or Seller in this Agreement, nor any statement or certificate furnished or to be furnished to Buyer pursuant hereto, or in connection with the transaction contemplated hereby, contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

5. Indemnity.

(a) The parties agree to indemnify each other and hold each other harmless from any loss or damage from the breach of any warranty or representation of the respective party set forth herein, including reasonable legal and accounting fees and expenses incurred by the other party as a result of such breach or in enforcing this indemnity.

6. Representations and Warranties of Buyer. Buyer represents and warrants to Seller as follows:

(a) Organization; Good Standing. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Minnesota with all requisite power and authority to perform its obligations hereunder.

(b) Compliance with Other Instruments, etc. Neither the execution nor the delivery of this Agreement nor the consummation of the transaction contemplated hereby will conflict with or result in any violation of or constitute a default under any agreements of Buyer, or any agreement, mortgage, indenture, license, permit or other instrument, judgment, decree, order, law or regulation by which Buyer is bound.

(c) Brokers. No broker or finder has been employed by Buyer in connection with this transaction.

(d) Authorization. The execution, delivery and performance of this Agreement by Buyer has been duly authorized by the Board of Directors of Buyer and the Agreement constitutes the valid and binding obligations of Buyer.

DocuSign Envelope ID: 59182CF0-17D5-4735-885E-2AD3ADA1B922

(e) Disclosure. No representation or warranty by Buyer in this Agreement, nor any statement or certificate furnished or to be furnished to Seller pursuant hereto, or in connection with the transaction contemplated hereby, contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

7. Covenants of Seller and Seller's Shareholders. Seller and Seller's Shareholders agree that prior to the Closing:

(a) Cooperation. Seller will use their best efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of third parties and to make all filings with and give all notices to third parties which may be necessary or reasonably required in order to effect the transactions contemplated hereby. Seller will use their best efforts to preserve Seller's business organizations intact and to keep available the services of its employees and representatives and will preserve the goodwill of its employees, customers, suppliers and others having business relations with Seller.

(b) Maintenance of Books and Records. Seller will maintain its books, accounts and records in the usual manner on a basis consistent with prior years. Seller will duly comply in all respect with all laws and decrees applicable to it and to the conduct of its business.

(c) Debts. All debts and trade payables of Seller will be paid as they become due in the normal course of business.

(d) Agreements Delivered, etc. Prior to the Closing Date, Seller will furnish to Buyer complete and accurate lists of the following: (i) all agreements or arrangements of Seller that are to be performed in whole or in part on or after the date hereof; (ii) all healthcare benefits agreements, bonus, incentive, death benefit or other fringe benefit plans, deferred compensation and post-termination obligations, trust agreements of Seller in effect or under which any amounts remain unpaid on the date hereof or are to become effective after the date hereof; and (iii) all employment and consulting contracts not terminable at will without penalty to which Seller is a party.

8. Covenants of Buyer.

DocuSign Envelope ID: 59182CF0-17D5-4735-885E-2AD3ADA1B922

(a) Good Faith. Buyer will faithfully perform on a timely basis all of its obligations required herein.

(b) Non-Competition & Non-Solicitation. In the event that this Agreement is terminated prior to the Closing date: 1) Buyer agrees it will not reverse engineer or build a listed asset, using confidential information obtained by Seller, for twelve (12) months from the date of this Agreement; and 2) Buyer also agrees that it will not solicit for employment or independent contracting, any employees or contractors of Seller, other than Frank Robles, without prior written consent of the Seller's Board of Directors and/or Officers for a period of twelve (12) months from the date of this Agreement.

9. Conditions Precedent to the Obligations of Seller and Seller's Shareholders. All obligations of Seller and Seller's Shareholders under this Agreement are subject to the fulfillment, at the option of Seller and Seller's Shareholders, at or prior to the Closing Date, of the following condition: The representations and warranties of Buyer herein contained shall be true on and as of the Closing Date with the same force and effect as though made on and as of said date, except as affected by the transaction contemplated hereby.

10. Conditions Precedent to the Obligations of Buyer. All obligations of Buyer under this Agreement are subject to the fulfillment of Buyer, at or prior to the Closing Date, of the following conditions:

(a) The representations and warranties of Seller herein contained shall be true on and as of the Closing Date with the same force and effect as though made on and as of said date, except as affected by the transaction contemplated hereby.

(b) Seller's Shareholders and Seller shall have performed all of their obligations and agreements and complied with all of its covenants contained in this Agreement to be performed and complied with by Seller prior to the Closing Date.

(c) Buyer shall be authorized by its Board of Directors to enter into this described Asset Purchase and Sale.

11. Securities Disclosures.

(a) Potential Loss of Investment. Seller understands that an investment in the Shares is a speculative investment which involves a high degree of risk and the potential loss of its entire investment. The Seller has had the opportunity to review the filings of the Buyer with

DocuSign Envelope ID: 59182CF0-17D5-4735-885E-2AD3ADA1B922

the U.S. Securities and Exchange Commission, and has made all necessary inquiries of management of the Buyer with regards to such filings.

(b) Investment Purposes. The Seller is acquiring the Shares for its own account as principal, not as a nominee or agent, for investment purposes only, and not with a view to, or for resale, distribution or fractionalization thereof in whole or in part, and no other person has a direct or indirect beneficial interest in the amount of restricted Shares the Seller is acquiring herein. Further, the Seller does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the restricted Shares the Seller is acquiring.

(c) Restrictive Legend. The Seller is aware that the Shares issued hereunder have not been registered with the Securities and Exchange Commission under the Securities Act of 1933, as amended, and have been offered pursuant to the exemption from registration contained in Section 4(2) of said Act and Regulation D promulgated thereunder on the ground that no public offering is involved, which reliance is based in part upon my representations set forth herein. It is further understood and agreed that the Shares subscribed for hereunder may not be offered, sold, transferred, pledged or hypothecated to any persons in the absence of registration under the Securities Act of 1933 and applicable state securities laws, or an opinion of counsel satisfactory to the Company that such registration is not required. It is further understood that a legend will be placed on Shares certificate which sets forth the restrictions set forth herein

12. Survival of Representations. All statements by or on behalf of Seller contained in this Agreement or any certificates or other instrument delivered by or on behalf of Seller in connection with the transaction contemplated hereby shall survive the Closing.

13. Entire Agreement. This Agreement supersedes all previous agreements among the parties and contains the entire understanding and agreement among them with respect to its subject matter. This Agreement cannot be amended, modified or supplemented in any respect except by a subsequent written agreement entered into by all parties. This Agreement is binding on all parties with full force and effect.

14. Waivers and Notices. Any failure by any party to this Agreement to comply with any of its obligations, agreements or covenants hereunder may be waived by Seller in the case of a default by Buyer and by Buyer in the case of a default by Seller. The failure of any party to

DocuSign Envelope ID: 59182CF0-17D5-4735-885E-2AD3ADA1B922

insist in any instance upon performance of any term or condition of this Agreement shall not be construed as a waiver of any future performance. All waivers under this Agreement and all notices, consents, demands, requests, approvals and other communications which are required or may be given hereunder or thereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed certified first class mail, postage prepaid:

(a) If to Seller:

R.C. Rondero de Mosier, COO
701 Brazos St., 16th Floor
Austin, TX 78701

(b) If to Buyer:

Robert Monster, CEO
PO Box 742
Bellevue WA 98009

or to such other person or persons at such address or addresses as may be designated by written notice to the other parties hereunder.

15. Benefits. All the terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their successors and assigns.

16. Expenses. Whether or not the transactions contemplated hereby are consummated, each of the parties hereto shall pay its or his own expenses incurred in connection with the authorization, preparation, execution or performance of this Agreement and all transactions contemplated hereby, including without limitation, all fees and expenses of agents, representatives, legal counsel and accountants. Seller shall pay all stamp, documentary, transfer or similar taxes which may be payable as a result of the sale.

17. Facsimile Signatures; Counterparts. The delivery of an executed copy of this Agreement or of any amendment hereto, made by facsimile or electronic transmission by any party to the other party hereto shall constitute effective delivery of such document by such transmitting party to such receiving party, and any executed facsimile or electronically transmitted copy so delivered shall be deemed equivalent to an executed original. This

DocuSign Envelope ID: 59182CF0-17D5-4735-885E-2AD3ADA1B922

Agreement and any amendments thereto may be signed in two or more counterparts, and all counterpart signatures, taken together, shall constitute one executed original.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**BUYER'S NAME**

DocuSigned by:

By: *Rob Monster*

Print Name: Rob Monster

Title CEO

**SELLER'S NAME**

DocuSigned by:

By *Willy Ogorzaly*

Print Name: Willy Ogorzaly

Title: CEO

DocuSign Envelope ID: 59182CF0-17D5-4735-885E-2AD3ADA1B922

Schedule A

**Shareholder Ratification**

The following Shareholders, constituting all of the shareholders of Congo, Ltd. ratify the foregoing Agreement.

DocuSigned by:

Willy Ogorzaly

DocuSigned by:

Russell Hinds

DocuSigned by:

Tyler Cox

DocuSigned by:

Marc Yagjian

DocuSigned by:

Victor Rojas

DocuSigned by:

Joe Burchard

DocuSigned by:

Brett Bloethner

DocuSigned by:

Capital Factory
By: Gordon Daugherty

DocuSigned by:

Ator Inc. f/b/o Capstone Trust for Entrepreneurship
By: Tihan Seale

DocuSign Envelope ID: 59182CF0-17D5-4735-885E-2AD3ADA1B922

Schedule B

**ASSETS**

1. Customer accounts and administrative data
2. Subscribed customers
3. All source code and supporting elements. To be more specific the following:
    a. Current Production Source Code - Also referred to as the MVP written in Rails with the most recent advancements.
    b. Current production database
    c. The original (MVP) AWS account, data, assets and S3 buckets
    d. IBM hosting agreement for the MVP
4. New code base - Written in Python, Django & Angular
5. The new AWS infrastructure
6. New code base databases (dev, staging and prod)
7. The new AWS contract used for the new infrastructure and associated accounts
8. All deployment scripts
9. The GitHub account along with all of the repositories
10. The new WordPress Plugin source code
11. FAQ Helpdesk Repository
12. Website analytics
13. Austin.law demo
14. Minnesota state bar demo
15. Maryland State bar demo
16. Supportive Elements / systems intact with all associated data and elements
    a. Intercom account
    b. PivotalTracker account
    c. Algolia account
    d. Maxmind account
    e. OpenTok / TokBox account

DocuSign Envelope ID: 59182CF0-17D5-4735-885E-2AD3ADA1B922

f. Cronofy agreement and associated agreements

g. Segment account

17. Other Agreements

a. Any city.law sales agreements

b. Eight ("8") pre-paid public relations announcement from PRWeb

c. $90,000 US Dollars in AWS credits, subject to expiration February 1, 2018.

d. Rackspace Aviator contract

e. Affinipay / LawPay agreements and associated accounts

# EXHIBIT 3

months to entitle me to approximately $35,000
since I was never paid a sufficient salary to be an "exempt" employee; (3) Labor Code

Labor Code Section 203 penalties, since I am still owed these wages post wrongful

have to retain counsel to enforce my rights, I will also be entitled to recover all attorneys'

consequence of the discharge of my duties, I am entitled to a reimbursement of $1,073.65

________ (December & January flights via SFO to AUS); (2)

________ (December & January team meals and meetings); and (3) $106.55 (SFO Parking &

, Labor Code Section 2802. Under federal law, failure to reimburse an

648 P.2d 673, 674 (Colo. App. 1982) [engaging in outside business activities are not breach of the duty of loyalty]; similarly, , No. G037468, 2007 WL 1404449, at *3 (Cal. Ct. App. May 14, 2007) [the duty of loyalty does not preclude an employee from engaging in outside business pursuits]. Moreover, I never

grossly negligent when I emailed John Porter. Preliminarily, Willy was fully aware of my

Notwithstanding, I do not harbor ill will toward Congo, and hope that this dispute resolves to everyone's satisfaction. Still, I am prepared to explore all remedies available to

Accordingly, I will enter into a settlement and release agreement subject to mutually

[redacted]

________

Best Regards,

*Michael Balducci*

Michael Balducci